CITIES OF ABILENE, et al., Appellants,

v.

PUBLIC UTILITY COMMISSION OF TEXAS, et al., Appellees.

No. 3-92-065-CV.

Court of Appeals of Texas, Austin.

May 5, 1993.

Rehearing Overruled July 7, 1993.

Barbara Day, Butler, Porter, Gay & Day, Austin, for City of Abilene, et al.

Jesus Sifuentes, Susan C. Gentz, Bickerstaff, Heath & Smiley, Austin, for City of McKinney.

Walter Washington, Austin, for Office of Public Utility Counsel.

Dan Morales, Atty. Gen., Steven Baron, Norma K. Scogin, Asst. Attys. Gen., Austin, for Public Utility Com'n of Texas, et al.

Brook B. Brown, McGinnis, Lochridge & Kilgore, Austin, for Central Telephone Co. of Texas and Lufkin–Conroe Telephone Exchange, Inc.

Anthony P. Gillman, Austin, for GTE Southwest Inc. and Contel of Texas, Inc.

Robert J. Hearon, Jr., Graves, Dougherty, Hearon & Moody, Austin, for Southwestern Bell Telephone Co.

Before CARROLL, C.J., and JONES and KIDD, JJ.

## ON MOTION FOR REHEARING

CARROLL, Chief Justice.

The opinion and judgment of the Court in this cause handed down on February 3, 1993, are withdrawn and the following opinion is substituted therefor.

Appellants[1] sought judicial review of the Public Utility Commission's (the "Commission") final order in a rate case concerning Southwestern Bell Telephone Company ("SW Bell") and other entities.[2] The district court affirmed the Commission's order, and the appellants seek reversal of the district court's judgment. While the Commission's order is predominantly correct, we conclude the Commission did not cor-

rectly apply the law as to income-tax savings resulting from expenses disallowed for ratemaking purposes. We will reverse the district court's judgment and remand the cause to the district court with instructions that it be remanded to the Commission for proceedings consistent with our opinion.

## PROCEDURAL BACKGROUND

The Commission initiated the agency proceeding as an inquiry into the reasonableness of SW Bell's existing rates pursuant to section 42 of the Public Utility Regulatory Act ("PURA"), Tex.Rev.Civ.Stat.Ann. art. 1446c, § 42 (West Supp.1993). The primary impetus for this rate case was consumer group concern that utility tax savings resulting from the Tax Reform Act of 1986 were not being passed through to ratepayers and that SW Bell was realizing excessive profits.

In January 1989, the Commission initiated the rate case as *Inquiry of the General Counsel Into the Reasonableness of the Rates and Services of Southwestern Bell Telephone Company*, Docket No. 8585.[3] The Commission directed SW Bell to file a "rate-filing package" based on 1988 as the test year. SW Bell also submitted a proposal for resolution of the rate case, its "Texas First Plan." The parties conducted

**1.** Appellants are the Office of Public Utility Counsel, the City of McKinney (appealing on separate points), and the following Texas cities: Abilene, Alamo, Allen, Alvin, Amarillo, Amherst, Arlington, Balcones Heights, Bay City, Big Wells, Benbrook, Blue Mound, Borger, Brackettsville, Breckenridge, Canadian, Cameron, Canyon, Carrizo Springs, Cisco, Clute, Columbus, Converse, Cotulla, Crane, Crowley, Crystal City, Dalworthington Gardens, Denison, Double Oak, Eagle Pass, Eagle Lake, Earth, East Mountain, Eastland, Edcouch, Edgecliff Village, Edinburg, Edna, El Campo, El Paso, Farmersville, Forest Hill, Floydada, Fort Stockton, Friendswood, Fritch, Garland, Goliad, Gordon, Grand Praire, Groves, Gruver, Hackberry, Hallsburg, Happy, Harlingen, Hedwig Village, Hereford, Hollywood Park, Hudson Oaks, Kenefick, Kermit, Kingsville, Lake Tanglewood, Laredo, La Villa, Longview, Lorenzo, Luling, Marlin, McAllen, Meadow, Mercedes, Mesquite, Midland, Missouri City, Monahans, Mount Pleasant, New Deal, Noonday, Olton, Palmhurst, Pampa, Pantego, Paris, Pearsall, Pecan Hill, Plainview,

Pharr, Rancho Viejo, Richmond, Rio Hondo, Rockwall, Rosenberg, San Antonio, San Juan, Schertz, Seminole, Sinton, Slaton, Stagecoach, The Colony, Thompsons, Timbercreek Canyon, Tiki Village, Tye, Tyler, University Park, Uvalde, Vega, Waco, White Settlement, and Woodsboro.

**2.** Appellees are the Public Utility Commission of Texas, Southwestern Bell Telephone Company, and the following intervenors: AT & T Communications of the Southwest, Inc., Lufkin–Conroe Telephone Exchange, Inc., Central Telephone, General Telephone Company of the Southwest, Contel of Texas, Inc., Fort Bend Telephone Cooperative, Guadalupe Valley Telephone Cooperative, MCI Telecommunications, State Purchasing & General Services, and Texas Statewide Telephone Cooperative, Inc.

**3.** In February 1989, this rate case was consolidated with another rate case involving SW Bell, the *Inquiry of the General Counsel Into the WATS Prorate Credit*, Docket No. 8212.

extensive discovery and filed written testimony supporting their various positions in advance of any hearing.[4]

Before the date set for the cost-of-service hearing, SW Bell, the Commission staff, and twenty-four other parties entered into a non-unanimous stipulation. This stipulation provided, in part, for rate reductions of approximately $73 million annually and upgrades in SW Bell services and facilities. The signatory parties presented the stipulation to the Commission for consideration as the basis for setting the rates at issue and filed written testimony in support of the stipulation provisions. The Office of Public Utility Counsel ("OPC"), a group of one hundred and fourteen Texas cities ("Cities"), the City of McKinney ("McKinney"), and several other intervenors opposed adoption of the stipulation.

To establish the procedure for the consideration of the stipulation, the Commission ordered that an initial hearing be conducted solely on the issue whether the stipulation should be adopted. If the Commission rejected the stipulation, the order provided that a full cost-of-service hearing would be held to set just and reasonable rates and that the parties to the stipulation would be free to pursue their previous positions. The Commission allowed all parties to conduct additional discovery and file additional written testimony before the stipulation hearing. At the conclusion of the stipulation hearing, the administrative law judge recommended that the Commission reject the stipulation because of SW Bell's failure to present evidence on its cost of service and invested capital. The Commission, however, adopted the stipulation with some minor modifications in its final order.

After exhausting their administrative remedies, the appellants sought judicial review in the district court of Travis County pursuant to section 69 of PURA and section 19 of the Administrative Procedure and Texas Register Act ("APTRA"), Tex. Rev.Civ.Stat.Ann. art. 6252–13a, § 19 (West Supp.1993). The trial court affirmed

the final order of the Commission adopting the stipulation. The Cities, OPC, and McKinney appeal the judgment of the trial court.

## THE STIPULATION PLAN

The stipulation, as adopted by the Commission, provided for a mix of rate reductions and other benefits to consumers. Under the stipulation, SW Bell would (1) provide a one-time credit to residential customers, (2) reduce certain other rates, including long distance access charges, and (3) upgrade SW Bell facilities and services. The stipulation also set up an "earnings sharing" plan, whereby SW Bell would return to consumers fifty percent of earnings within a specified range and one hundred percent of earnings above that range. Additionally, certain SW Bell rates were subject to a four-year "rate cap."

## THE DISPUTE

On appeal, the Cities and OPC complain of (1) the adoption of the non-unanimous stipulation as the basis for the Commission's order; (2) the sufficiency of the evidence to support the finding of a reasonable rate of return; (3) the consideration of the test-year cost-of-service data in setting rates; (4) the implementation of the "earnings sharing" plan; (5) the inclusion of a hypothetical federal income tax expense in cost of service; and (6) the inclusion of inappropriate affiliate expenses in cost of service. By separate points, McKinney complains of the "extended metropolitan service" rates set by the stipulation and the Commission's order.

## DISCUSSION AND HOLDING

In Texas, utility rates are set by the same test whether a utility seeks a rate increase or outside entities seek a rate decrease. *See* PURA §§ 42, 43. In both instances, the utility bears the burden of proof to show just and reasonable rates.

---

**4.** The Cities argued for approximately $738 million in rate reductions annually; the OPC for approximately $595 million in rate reduction annually; and the Commission staff for rate reductions of approximately $392 million annually. SW Bell's rate filing package asserted that a rate increase of approximately $139 million annually was appropriate.

PURA § 40(b); *Suburban Util. Corp. v. Public Util. Comm'n,* 652 S.W.2d 358, 366 (Tex.1983). The establishment of just and reasonable rates requires consideration of three factors: (1) the utility's reasonable operating expenses; (2) the utility's rate base; and (3) the reasonable rate of return. PURA § 39. A regulated utility is entitled to rates that provide a "reasonable opportunity to earn a reasonable return on its invested capital...." PURA § 39(a); *see Suburban Util. Corp.,* 652 S.W.2d at 362.

Rates are set in a two-step process. First, the overall revenue the utility is entitled to recover is set, a process often referred to as setting "revenue requirements." Second, a "rate design" of individual rates for classifications of customers and services is determined. *See Texas Alarm & Signal Ass'n v. Public Util. Comm'n,* 603 S.W.2d 766, 768 n. 2 (Tex. 1980). The Cities and OPC complain of the operating-expense and rate-of-return elements of the revenue-requirement determination, while McKinney complains of the rate design as applied to its residents.

■ In reviewing an agency order, we may not substitute our discretion or judgment for that of the agency; we may reverse the agency's decision only if it is not supported by substantial evidence, is arbitrary, or results from an abuse of discretion. *Railroad Comm'n v. Continental Bus Sys., Inc.,* 616 S.W.2d 179, 181 (Tex. 1981). An agency's decision is arbitrary or results from an abuse of discretion if the agency has (1) failed to consider a factor the legislature directed it to consider, (2) relied upon an irrelevant factor, or (3) weighed only relevant factors that the legislature directed it to consider but still reached a completely unreasonable result. *Gerst v. Nixon,* 411 S.W.2d 350, 360, n. 8 (Tex.1966); *Statewide Convoy Transp., Inc. v. Railroad Comm'n,* 753 S.W.2d 800, 804 (Tex.App.—Austin 1988, no writ).

### Adoption of the Non–Unanimous Stipulation

The Cities' first point of error and OPC's first and eighth points of error complain of the Commission's adoption of the non-unan-imous stipulation. The Cities and OPC argue that the Commission (1) failed to consider the statutory factors in setting rates; (2) considered irrelevant nonstatutory factors in setting rates; (3) failed to make an evaluation of SW Bell's reasonable and necessary expenses; (4) made improper implied adjustments to test-year data; and (5) in considering the stipulation, used a procedure that was not proper under PURA and that violated due-process principles.

■ We recently considered the adoption of a non-unanimous stipulation in a rate case. *See City of El Paso v. Public Util. Comm'n,* 839 S.W.2d 895 (Tex.App.—Austin 1992, writ granted). In *City of El Paso* we determined that a non-unanimous stipulation could be considered as a basis for a final order in a rate case as long as nonstipulating parties had an opportunity to be heard on the merits of the stipulation and the Commission made an independent finding on the merits, supported by substantial evidence in the record, that the stipulation set just and reasonable rates. *Id.* at 903. The consideration of a non-unanimous stipulation as a basis for the final order is proper unless it is "arbitrary, unreasonable, an abuse of discretion, or involves consideration of factors other than those the legislature has directed the Commission to consider." *Id.* at 904.

■ In their arguments that the Commission failed to consider statutory factors, considered irrelevant factors, failed to analyze SW Bell's operating expenses, and made improper adjustments to test-year data, the Cities and OPC essentially contend, that in adopting the stipulation, the Commission did not conduct the analysis PURA requires in rate cases. In *City of El Paso* we stated:

> [A]ppellants impliedly urge us to *presume* that, by basing its final order partially on stipulated matters, the Commission completely abdicated its responsibility to determine disputed issues. We may not so presume; indeed, the law compels a contrary presumption. In reviewing a challenged administrative order, we must presume its validity. The

challenger bears the burden of showing error.

*Id.* at 902 (citations omitted). We believe this statement applies equally in the immediate case. The Cities and OPC complain that the Commission did not conduct a line-by-line cost-of-service analysis in setting SW Bell rates. However, the record reflects that all parties presented evidence and that the Commission made findings of fact on the relevant issues. We find nothing in the record to compel the conclusion that the Commission failed to properly discharge its statutory duties.

The Cities and OPC argue that the Commission findings were not based on any real evidence. Rather than rely on the pre-filed testimony and SW Bell's rate-filing package, the signatory parties to the stipulation jointly offered new written testimony to support the stipulation. The Cities and OPC argue that this evidence reflects artificial numbers generated to support the stipulation. However, that contention, if assumed true, does not negate the probative value of the evidence. It would be as artificial to require the stipulating parties to argue their prior extreme positions in support of compromise numbers. The Commission recognized this situation and ordered that the signatory parties be grouped as one party for briefing, presentation of witnesses, and cross-examination at the stipulation hearing. The opponents to the stipulation were given a full opportunity to present evidence to contradict the stipulation and to refute the evidence presented to support its adoption.

■ In reviewing the sufficiency of the evidence to support an agency order, we apply the substantial-evidence test. This Court has extensively discussed the substantial evidence test in *Lone Star Salt Water Disposal Co. v. Railroad Commission*, 800 S.W.2d 924, 928 (Tex.App.—Austin 1990, no writ):

> To determine whether an agency's decision is supported by substantial evidence, as APTRA § 19(e)(5) requires, we must determine whether, in considering the record upon which the decision is based, the evidence as a whole is such that

reasonable minds could have reached the conclusion which the Commission must have reached in order to justify its action. In determining whether there is substantial evidence to support the order, the reviewing court may not substitute its judgment for the Commission's, and must consider only the record upon which the decision is based. The evidence in the agency record may actually preponderate against the Commission's decision, but still amount to substantial evidence supporting it. The burden is on the complaining party to demonstrate an absence of substantial evidence.

> Final orders of the Commission are presumed to be valid. Where the evidence in the record before an agency will support either an affirmative or a negative finding, the agency order must be upheld. Any conflict in the evidence must be resolved in favor of the agency's decision. (Citations omitted.)

The stipulation itself and the testimony offered to support a finding that rates were just and reasonable under the stipulation constitute substantial evidence. *City of El Paso*, 839 S.W.2d at 907. Evidence was presented supporting either adoption or rejection of the stipulation. We may not substitute our judgment on the weight and credibility of the evidence for that of the Commission. APTRA § 19(e).

■ The Cities also complain that the procedure the Commission used in considering the stipulation denied the stipulation opponents due process. Appellants argue that the hearing, being limited to the issue of whether to accept or reject the stipulation, denied the opponents the opportunity to present their proposals for consideration.

The adoption of a non-unanimous stipulation raises several due-process concerns. The most obvious is the possibility that opposing parties may be denied an opportunity to present evidence against acceptance of the stipulation. A more subtle problem is the possibility of an unintentional shift of the burden of proof from the utility to the opponents of the stipulation. There is a danger that when presented with a ready-

made solution, the Commission might unconsciously require that the opponents refute the agreement, rather than require the utility to prove affirmatively that the proposed rates are just and reasonable. This danger is increased when the Commission staff is a signatory party and is in a position of advocating the stipulation.

In *City of El Paso* and in *Mobil Oil Corp. v. Federal Power Commission,* 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974), the procedural facts are somewhat distinguishable from the instant case. In both *City of El Paso* and *Mobil,* the stipulations were negotiated only after extended litigation, and extensive hearings on the merits preceded the hearings for adoption of the stipulations. In *City of El Paso,* the rate case was initially divided into three phases—revenue requirement, prudence review of a nuclear project, and rate design. In that case, a fourth phase was later added to consider the stipulation. In the immediate case, however, the chronology was reversed; the stipulation hearing was a preliminary matter. The Commission's order provided that in the event that the stipulation was rejected, the parties would return to their pre-stipulation positions and the hearing would begin anew as an ordinary rate case. Nonetheless, the opponents had a full opportunity to present evidence on all issues at the hearing on the stipulation. We conclude that in the immediate case the procedural distinction does not compel a result different from our decision in *City of El Paso.*

The Cities cite a Missouri case for the proposition that the limited hearing violates due process. *See State ex rel. Fisher v. Public Serv. Comm'n,* 645 S.W.2d 39 (Mo. Ct.App.1982). The *Fisher* case presents a similar procedural history of a preliminary hearing to consider a non-unanimous stipulation in a rate case. That hearing was also limited to a determination of acceptance or rejection of the stipulation. The court determined that the opponents did not have an opportunity to present any positions which could be adopted at the stipulation hearing and, thus, were denied due process. We do not find this rationale compelling. Clearly, in the immediate cause, the opponents to the stipulation were able to present their positions that the stipulation should be rejected and greater rate reductions ordered fully. The opponents were given the opportunity to present the entirety of their case at the stipulation hearing. Only the scope of the Commission's *decision* was limited. The procedure used in this case offered adequate opportunity for all parties to present their positions for the Commission's consideration. We reject the rationale in *Fisher* and reaffirm our test in *City of El Paso.*

■ In their motion for rehearing, the Cities cite a recent Texas Supreme Court case finding a Mary Carter agreement void as violative of public policy and argue that the stated policy disfavoring agreements which promote rather than discourage further litigation should apply to the stipulation in this cause.[5] *See Elbaor v. Smith,* 845 S.W.2d 240, 247–52 (Tex.1992). We disagree. The stipulation in this cause is not a Mary Carter agreement. Nor do we believe the stipulation promoted litigation in this cause. We conclude that the policy considerations set out in *Elbaor* do not require that the stipulation be rejected.

The test for the procedural propriety of the consideration of a non-unanimous stipulation is set out in *City of El Paso.* The nonsignatory parties must be afforded an opportunity "to be heard on the merits of the stipulation," and the Commission's order should be based on an independent finding of just and reasonable rates based on the statutory factors and substantial evidence. *City of El Paso,* 839 S.W.2d at 903. In this case after a separate hearing on the stipulation was set, all parties were allowed additional discovery. At the hearing, the Cities and OPC presented unrestricted evidence and contentions and were provided the procedural safeguards mandated by APTRA. The Commission made

---

5. A Mary Carter agreement is defined as an agreement whereby a "settling defendant retains a financial stake in the plaintiff's recovery *and*

remains a party at the trial of the case. *Elbaor,* 845 S.W.2d at 247.

extensive findings of fact and conclusions of law to support its ultimate determination that the stipulation resulted in just and reasonable rates. We conclude that the procedure complied with the *City of El Paso* criteria. We find nothing in the record to indicate that the Commission shifted the burden of proof from SW Bell to the stipulation opponents. The Cities' first point of error and OPC's first and eighth points of error are overruled.

## Rate of Return

■ The Cities' third point of error complains of the sufficiency of the evidence to support the Commission's finding of a reasonable rate of return. The Cities complain that there was not substantial evidence in the record to support the entire range of return the Commission awarded. The Commission found that SW Bell's current cost of equity was in a reasonable range between 11.5 and 13.0 percent and that the range of SW Bell's overall cost of capital between 10.49 percent and 11.36 percent was reasonable. By alternative calculation methods, the Commission found SW Bell's rate of return on investment under the stipulation to be either 10.86 or 11.20 percent, both within the range found reasonable. The earning-sharing provisions of the stipulation stated that SW Bell would retain all return on investment up to 12.06 percent (14.2 percent return on equity); would refund 50 percent of return on investment between 12.06 and 14.5 percent (14.2 and 18.41 percent return on equity) to consumers; and would refund 100 percent of any return on investment greater than 14.5 percent (18.41 percent return on equity) to consumers.

The Cities argue that, under the stipulation, SW Bell may earn a return on equity of up to 16.3 percent [6] (13.28 percent return on investment), a rate that exceeds both the adopted reasonable range ceiling of 13.0 percent and any evidence in the record. This argument ignores the pro forma nature of ratemaking in which a hypothetical

reasonable rate of return is determined based on adjusted test-year data and future rates set to produce approximately that return. In a conventional rate case there is no consideration of future changes in the actual rate of return. If consumer use exceeds projections or operational costs are reduced to create a greater return from the set rates, the utility retains the entire windfall until the next rate case adjusts the rate of return and individual rates. The potential of future events which may result in a return greater than the reasonable rate of return does not make the finding of the reasonable rate of return erroneous or unsupported by evidence. In the immediate case, the rate of return on investment was set at a rate the Commission found reasonable, 10.86 or 11.20 percent, depending on the calculation method. However, the Commission went on to provide a distribution to the consumers in the event of a greater return.

■ The stipulation itself constitutes evidence. *City of El Paso*, 839 S.W.2d at 907. The signatory parties also presented testimony and evidence to support a finding that the stipulation provided for just and reasonable rates. We conclude that substantial evidence exists in the record to support the finding that the stipulation set a reasonable rate of return. We will not substitute our judgment on the weight of that evidence for that of the Commission. Accordingly, we overrule the Cities' third point of error.

## Test–Year Expenses

■ In its second point of error, the OPC complains that in adopting the 1988 test-year expenses and in assuming that the stipulation included implied adjustments to these expenses, the Commission did not properly analyze the expenses as PURA required. The OPC cites *Coalition of Cities for Affordable Utility Rates v. Public Utility Commission*, 798 S.W.2d 560, 563 (Tex.1990), for its holding that "book" expenses carry no presumption that

---

**6.** The Cities calculate this rate as the greatest potential return on equity to SW Bell under the earnings sharing provisions—all earnings up to

14.2 percent plus 50 percent of earnings between 14.2 and 18.41 percent.

they are reasonable and necessary and the utility did not carry its burden of proof by merely "opening its books to inspection." The OPC argues that the Commission could not properly rely on SW Bell's actual 1988 expenses and that, in doing so, the Commission failed to hold SW Bell to its burden of proof. We disagree.

The record reflects that the Commission did not blindly accept SW Bell's book expenses. The Commission examined the evidence and testimony presented on cost of service, including portions of the rate-filing package, and made adjustments to the book expenses to conform with the requirements of PURA and to account for the effects of the stipulation. The opponents were given an opportunity to examine the evidence supporting the stipulation through discovery and to present evidence and argument against adoption of the stipulation at the hearing. We conclude that substantial evidence exists in the record to support the Commission's finding that the adjusted 1988 test-year expenses represent reasonable SW Bell operating expenses. Accordingly, we overrule OPC's second point of error.

### Earnings Sharing Plan

 The Cities' fourth point of error and OPC's fifth, sixth, and seventh points of error complain of the Commission's implementation of an "earnings sharing plan." The Cities and OPC argue that the plan is not authorized under PURA and that the elements of the plan are not supported by substantial evidence. The Cities additionally argue that the plan provides for illegal retroactive refunds, illegally fixes rates for four years, improperly substitutes monitoring for conventional regulation, and constitutes an advisory opinion in that it allows SW Bell to file for nonmajor future rate increases without a full rate-filing package. OPC also complains that in adopting the plan the Commission failed to consider statutory factors and, instead, considered irrelevant factors.

The initial question the Cities and OPC raise under these points of error is whether PURA authorizes the Commission to order an "earning sharing plan." The Cities and OPC characterize this type of ratemaking as "incentive regulation," and argue that it conflicts with the cost-of-service-based regulation under PURA and is not authorized. The Cities and OPC rely on the statement in section 18(e)(1) that "nothing in this section is intended to change the burden of proof of the local exchange company under Sections 38, 39, 40, and 41...."

The policy underlying the earning sharing plan is to promote increased efficiency in SW Bell's operations. Faced with frozen rates, SW Bell may increase profits by making its operations more cost efficient. Section 39(b) of PURA authorizes the Commission to consider, among other factors, "the efficiency of the utility's operations" in setting a reasonable rate of return on invested capital. Section 18(a) authorizes the Commission to carry out the policies of protecting "the public interest in having adequate and efficient telecommunications service available to all citizens ... at just, fair, and reasonable rates" by nontraditional "regulatory rules, policies, and principles" as necessitated by the growing and increasingly competitive telecommunications industry. Additionally, PURA section 2 mandates a balancing of consumer and utility interests in setting rates.

We conclude that nothing in the plan or this proceeding has relieved SW Bell of its burden to show that the proposed rates are just and reasonable. The Commission found that SW Bell met that burden, and we will not substitute our judgment for that of the Commission.

OPC argues that the Commission improperly considered nonstatutory factors in adopting the earnings-sharing provisions. OPC contends that the Commission improperly considered factors set out in its findings of fact 147 and 150 in adopting the earnings sharing plan.[7] OPC contends that

---

7. These findings of fact state:

147. The earnings thresholds set forth in the Stipulation are reasonable because they were

negotiated by parties having opposing interests, because they are comparable to the thresholds in similar plans adopted by other

consideration of these factors violated PURA section 39(b). Section 39(b) sets out factors for the Commission to consider in setting a reasonable return on invested capital.[8] However, this section does not purport to set out exclusive factors for ratemaking consideration. Section 39(b) only lists factors to be considered "in addition to other applicable factors." The Commission made several other findings of fact indicating consideration of operational efficiency. The Commission found that the earning-sharing provisions would promote greater efficiency by SW Bell. We believe that the Commission properly considered these factors.

■■■ The Cities and OPC argue that the Commission failed to "fix" a rate of return as PURA section 39(a) requires. By providing for a range in the earnings sharing plan, the Cities contend that the Commission failed to fix the reasonable rate of return at an exact point. We do not believe that section 39(a) requires the Commission to fix an exact rate of return. Section 39(a) requires that the Commission fix overall revenues at a level that will permit the utility a reasonable opportunity to earn a reasonable return.[9] The Commission met this requirement by finding that SW Bell's rate of return on investment was either 10.86 or 11.20 percent under the two calculation methods, numbers within both the range of evidence and the range of return on investment the Commission found reasonable. *See Public Util. Comm'n v. GTE–SW*, 833 S.W.2d 153, 159 (Tex.App.— Austin 1992, writ granted). That the Com-

mission also made provision for sharing of prospective excess profits does not make this determination invalid. We conclude that the Commission has satisfied the requirements of section 39(a).

The Cities contend that the Commission authorized unlawful retroactive ratemaking by providing for consumer refunds of excess profits. The Cities failed to preserve this error in its motion for rehearing before the Commission. *See* APTRA § 16(e); *United Sav. Ass'n v. Vandygriff*, 594 S.W.2d 163, 168–70 (Tex.Civ.App.— Austin 1980, writ ref'd n.r.e.).

■■■ The Cities contend that the Commission unlawfully fixed rates for four years. The stipulation provides that SW Bell could not raise rates on certain basic services for four years and could not bring a major rate case unless its rate of return on investment fell below 10.49 percent for a full year. This provision is an integral part of the earnings sharing plan in that it provides the necessary protection for consumers and fixes a significant portion of SW Bell's revenues so as to provide an incentive for long-term increases in operational efficiency. The Cities argue that the stipulation also limits the Commission's power to inquire into unreasonable rates pursuant to PURA section 42. In making this argument, the Cities refer to paragraph 27 of the stipulation which provides "[i]f both unforeseen and unusual events act to cause the Stipulation and Agreement to function in a manner which is contrary to the public interest, the [Commission] or the parties may seek modification to the

---

jurisdictions, and because they are well within the range of actual earnings of similar businesses.

150. What might not be reasonable in the context of a traditional rate case resulting in the prescription of a new, fixed rate schedule may well be reasonable under a sharing formula whereby basis [sic] rates are frozen, any improvement in earnings must be the product of improved efficiency and any gains beyond specified levels must be shared with customers, thereby resulting in lower overall rates.

8. Section 39(b) provides: "In fixing a reasonable return on invested capital, the regulatory authority shall consider, in addition to other applicable factors, efforts to comply with the statewide energy plan, the efforts and achieve-

ments of such utility in the conservation of resources, the quality of the utility's services, the efficiency of the utility's operations, and the quality of the utility's management." Tex.Rev. Civ.Stat.Ann. art. 1446c, § 39(b) (West Supp. 1993).

9. Section 39(a) provides: "In fixing the rates of a public utility the regulatory authority shall fix its overall revenues at a level which will permit such utility a reasonable opportunity to earn a reasonable return on its invested capital used and useful in rendering service to the public over and above its reasonable and necessary operating expenses." Tex.Rev.Civ.Stat.Ann. art. 1446c, § 39(a) (West Supp.1993).

Stipulation and Agreement or may initiate a general inquiry into the reasonableness of [SW Bell's] rates or earnings." [10] Paragraph 27 further states that the stipulation "will not be modified absent notice, hearing, and a Commission determination that such modification is in the public interest." The Cities contend that the language "unforeseen and unusual acts" creates an unlawful threshold to initiation of a section 42 action. We do not read such a requirement into the provision. Paragraph 27 operates only as an affirmation of the Commission's authority. The Commission retains full authority to initiate an inquiry into SW Bell's rates at any time. Additionally, the Cities, OPC, or any other nonsignatory to the stipulation could bring a PURA section 42 complaint at any time.

The Cities contend that the Commission improperly substituted monitoring for regulation and that this allows SW Bell to recover automatically any cost changes during the term of the stipulation.[11] This argument ignores the situation in the immediate case and in rate cases in general. In this case, as in ordinary rate cases, rates are fixed until the next rate case. The inquiry into reasonable operating costs is a "snapshot" inquiry based on the test year. It is not intended to account for future cost changes. Adjustment for these changes will be made in future rate cases. While SW Bell is free to incur any additional costs it chooses, it may not recover any of these additional costs through higher rates absent a proceeding under PURA section 43 and a Commission order. Additionally, as discussed above, the Commission retains full authority to initiate an inquiry into the reasonableness of SW Bell's rates pursuant to PURA section 42. We conclude that the monitoring provisions are in addition to, and do not infringe upon, the Commission's regulatory powers.

The Cities argue that the approval of SW Bell's application for nonma-jor rate increases without a full rate-filing package is an improper advisory opinion by the Commission. However, the stipulation also authorizes the Commission to require a rate-filing package in any proceeding if good cause is shown. The distinction between "major" and "nonmajor" rate cases is supported by PURA section 43(b). We believe that the implementation of procedural provisions for nonmajor rate cases is within the Commission's discretion. Nothing in the stipulation or the Commission's order abrogates SW Bell's burden of proof in such cases or operates as a pre-approval of nonmajor rate changes. We conclude that this provision does not constitute an advisory opinion.

We believe that the earnings sharing plan the Commission approved falls within the type of innovative regulation section 18(a) authorizes and was based on consideration of proper factors. Given that we have concluded that the Commission properly considered the statutory factors, we see no conflict between the earnings sharing plan and traditional ratemaking. Additionally, we conclude that substantial evidence exists in the record to support each of the individual elements of the plan. We overrule the Cities' fourth point of error and OPC's fifth, sixth, and seventh points of error.

### Federal Income Tax Expense

The Cities' second point of error and OPC's third point of error complain of the Commission's inclusion of a hypothetical federal income tax expense in SW Bell's cost of service. The Cities and OPC argue that this tax expense did not reflect the actual tax paid by SW Bell in that it failed to account for tax savings resulting from (1) the consolidated tax return Southwestern Bell Corporation ("SBC") filed on behalf of SW Bell and other subsidiaries and (2) deductions actually taken for expenses the Commission disallowed for ratemaking

10. This language of paragraph 27 is essentially duplicated in Commission finding of fact number 30(y).

11. During the term of the stipulation, SW Bell is required to file monthly, quarterly, semiannual, and annual reports with the Commission and OPC. These reports are used to monitor SW Bell's performance and to determine whether earnings sharing is required.

purposes. The Cities also argue that the Commission erred in assuming that the stipulated income tax expense implicitly accounted for SW Bell's tax expense savings resulting from the Tax Reform Act of 1986.

■ The standard for the inclusion of a utility's income tax expense in cost of service is whether the utility actually incurred the expense, *i.e.*, the amount of taxes actually paid. *Public Util. Comm'n v. Houston Lighting & Power Co.*, 748 S.W.2d 439, 442 (Tex.1987); *GTE–SW*, 833 S.W.2d at 163.

SBC is the parent company of SW Bell. SBC files a consolidated income tax return for its subsidiary companies, not all of which are regulated utilities. If some of the unregulated utilities post a net loss, then the total SBC tax bill is reduced. In *GTE–SW* we held that, under PURA section 41(c)(2), the Commission must compute the utility's tax savings under a consolidated tax return to determine if a savings would result and, if so, calculate the utility's "fair share" of the savings. *GTE–SW*, 833 S.W.2d at 163. The utility's share of the savings must be passed on to the ratepayers in lower rates. *Id.* at 165.

■ To support a conclusion, as the Commission made in this case, that no adjustment to income tax expense is necessary under PURA section 41(c)(2), the Commission is required to find either (1) that it was not advantageous for the utility to consolidate returns, or (2) that the Commission has computed taxes as though a consolidated return were filed and the utility had received its fair share of the savings from the consolidated return. *GTE–SW*, 833 S.W.2d at 168. In *GTE–SW* we held that the general finding that "no adjustment for a consolidated tax return was necessary," was insufficient. However, in the immediate case, the Commission went beyond such a general finding. The Com-

mission made specific underlying fact findings that SBC actually filed a consolidated return and that SW Bell had received its fair share of the resulting tax savings pursuant to the tax allocation agreement among the SBC subsidiaries. This indicates that the Commission reviewed the consolidated return, SW Bell's tax expense, and the tax allocation agreement and found that SW Bell received its "fair share" of any tax savings. We find substantial evidence in the record to support this finding. These determinations essentially satisfy the *GTE–SW* test, and in any event, we should not be "hypertechnical" in requiring a precise form of findings of underlying fact. *Allied Bank Marble Falls v. State Banking Bd.*, 748 S.W.2d 447, 448–49 (Tex. 1988). In *GTE–SW* we held that section 41(c)(2) required that the Commission impute to the utility its "fair share" of any tax savings resulting from a consolidated return. "Fair share" is not defined by PURA. Therefore we must conclude that the legislature left this determination to the discretion of the Commission. The Commission may determine that the utility's "fair share" is zero, as it did in this proceeding, that the utility is entitled to all tax savings, or any allocation between these extremes.[12] We do not construe section 41(c)(2) to require any set allocation of these tax savings. If the Commission's determination is supported by substantial evidence, there is no error. Therefore, the Commission could reasonably conclude that no adjustment to SW Bell's income tax expense was necessary to account for the consolidated return.

The Texas Supreme Court has held that when a utility claims income tax deductions for all expenses it has incurred, including expenses disallowed for ratemaking purposes, the resulting tax savings should inure to the benefit of ratepayers. *Houston Lighting & Power*, 748 S.W.2d at 442. In *GTE–SW* we rejected an argument that

---

**12.** We contrast consolidated return tax savings under section 41(c)(2) with tax savings for disallowed expenses under section 41(c)(3). Tax savings resulting from the utility's disallowed expenses directly apply to the utility's tax bill. Tax savings resulting from a consolidated re-

turn attributable to losses posted by unregulated entities, however, require a Commission determination of the connection of the unregulated entity to the utility and an allocation of the tax savings based on this connection.

consideration of the savings resulting from deductions disallowed for ratemaking purposes would violate section 41(c)(3). *GTE–SW*, 833 S.W.2d at 169. We concluded that section 41(c)(3) forbids only the passing along disallowed *expenses* to ratepayers, not passing through resulting tax *savings*, and that *Houston Lighting & Power* required that all tax savings go to ratepayers, pursuant to section 39 of PURA. *Id.*

■ In the immediate case, the Commission found that an adjustment to income tax expenses for deductions relating to disallowed expenses would involve an impermissible consideration of expenses that are excluded from ratemaking as unreasonable or unlawful. This finding is virtually identical to the reasoning we rejected in *GTE–SW*. Under the "actual taxes paid" test, any utility tax savings must benefit ratepayers. Therefore, if SW Bell realized tax savings resulting from deductions, these savings must apply to reduce rates, even if the underlying deduction could not be included as expenses in SW Bell's cost of service.

The appellees have argued that, in the event the Commission erred in calculating income tax expenses, such error is harmless because the total "benefits" to consumers under the stipulation plan would far exceed any additional rate reductions necessary to correct the error.[13] Appellees contend that the language of APTRA section 19(e) that a cause may be reversed or remanded "if substantial rights of the appellant have been prejudiced" requires that appellants show that any error is not offset by the total benefits to ratepayers under the stipulation. We do not find this argument persuasive, as it presumes that the effect of any error in calculating cost of service can be weighed against the total benefits of the stipulation on an incremental basis. Although the Commission found that it would require at least an annual rate reductions of $418 million to exceed the stipulation benefits, we do not believe

that consumer's rights may be prejudiced only if the Commission's error in applying the law causes a rate miscalculation in excess of this amount.

SW Bell and the Commission have stated that the effect of any error in the Commission's application of section 41(c)(3) is to overstate SW Bell's tax expense by approximately $3.23 million ($9.5 million in disallowed expenses multiplied by SW Bell marginal tax rate of 34%). In its motion for rehearing, SW Bell has urged that this error is harmless because its return on investment after adjustment for this error will remain within the range the Commission found reasonable. Whether the error causes the overall rates to be unreasonable is initially a question for the Commission. In any event, consumers are entitled to rates that reflect a proper application of the law. Accordingly, a remand to the Commission is proper to determine what, if any, further rate reductions are due consumers.

We overrule the Cities' second point of error and OPC's third point of error as to consolidated tax return savings, but we sustain these points of error as to tax savings resulting from deductions for disallowed expenses.

## Affiliate Expenses

The Cities' fifth point of error and OPC's fourth point of error complain of the Commission's inclusion of expenses of SW Bell's transactions with its affiliated companies in its cost of service. Specifically, the Cities and OPC complain of the inclusion of the costs of SW Bell's transactions with SBC and Bell Communications Research, Inc. ("Bellcore"). SW Bell is a wholly-owned subsidiary of SBC, which provides certain centralized services to its subsidiaries. SW Bell is a co-owner with other SBC subsidiaries of Bellcore, which conducts research and development work for its owners and other affiliated companies. The Cities also complain that SW

---

13. SW Bell and the Commission have also urged this harmless-error/lack-of-substantial-prejudice argument as to each of the Commission's alleged errors in calculating the cost-of-service errors. Because we resolve these issues on other grounds, we do not reach this argument under the other points of error.

Bell has failed to prove the reasonableness and necessity of its yellow pages expenses.

■ As to SBC and Bellcore expenses, the Cities and OPC complain that the Commission failed to make underlying findings of fact to support its ultimate findings that the prices SW Bell paid were no greater than the prices charged to other affiliates. The Cities and OPC failed to urge this error in their motions for rehearing in the Commission; therefore, this complaint is waived. *See* APTRA § 16(e); *United Sav. Ass'n,* 594 S.W.2d at 168–70. The Cities also argue that the Commission should have gone further in setting out its rationale for rejecting the hearing examiner's recommendation for disallowance of a portion of the expenses.[14] We are aware of no requirement under PURA or APTRA for such findings of fact. The Commission is within its discretion to accept or reject recommendations of its hearing examiners.

■ PURA section 41(c)(1) requires that payments to an affiliate be reasonable and necessary. In determining that the expenses of transactions with affiliated companies are reasonable and necessary, the Commission must make subsidiary findings that (1) each item or class of items is "reasonable and necessary" and (2) the price paid by the utility is no higher than the prices charged to other affiliates or unaffiliated persons. *GTE–SW,* 833 S.W.2d at 160. The Cities and OPC contend that the Commission failed to make these findings.

The Cities and OPC contend, as to the SBC expenses, that (1) the Commission failed to make a finding that the allocation of costs among SBC subsidiaries reflects the costs and the relative benefits to each subsidiary, (2) the Commission included in the SBC allocation expenses which could not be allowed for ratemaking, and (3) the Commission failed to make a finding that each item of SBC expenses is reasonable and necessary.

SBC expenses are allocated to affiliates by four methods: direct billing, employee-factor allocation, investment-factor allocation, and general-factor allocation. The Commission made a finding of fact that each of the allocation methods resulted in costs no higher than costs to other affiliates. The Commission also found that each of the methods produced "a reasonable result based on cost causation and benefit received" and that the services provided by SBC were charged to its subsidiaries at cost.

The Commission found that the SBC expenses had been adjusted by the removal of legislative advocacy, advertising, and membership expenses. The Commission found that the majority of services SBC provided were nondiscretionary and that economies of scale produced benefits by grouping these activities in a central entity. These findings could reasonably lead to the Commission's conclusion of law that SW Bell had met its burden of proof that its SBC expenses were reasonable and necessary. We conclude that, as to the SBC expenses, the Commission made all findings required by section 41(c)(1).

■ As to Bellcore, the Cities and OPC argue that the Commission failed to make the required findings to support allowance of these expenses. The Commission made findings of fact that each of Bellcore's projects was "reasonable and necessary" and that charges to SW Bell were no higher than the charges to the other co-owners of Bellcore or unaffiliated third parties. We conclude that the Commission satisfied the requirements of section 41(c)(1). *See GTE–SW,* 833 S.W.2d at 160–61.

■ Additionally, the Cities complain that SW Bell failed to prove the reasonableness and necessity of its yellow pages expenses. Pre-tax revenues of yellow pages affiliates are imputed to the regulated utility for ratemaking purposes. Generally, the Commission has required this adjustment to avoid the possibility of advertising profits being protected in an unregulated

**14.** The Cities also make this argument as to the hearing examiner's recommendation that yellow

pages income imputed to SW Bell be increased.

subsidiary. The Cities allege that the amount of yellow pages income imputed to SW Bell should have been greater and that the Commission failed to comply with the findings requirement of PURA section 41(c)(1). By its terms, section 41(c)(1) applies only to transactions whereby the utility purchases "services, ... property, right or thing ..." from an affiliate. *See General Tel. Co. of the S.W. v. Public Util. Comm'n*, 628 S.W.2d 832, 840 (Tex.App.—Austin 1982, writ ref'd n.r.e.). While SW Bell does purchase other services from its yellow pages affiliate, Southwestern Bell Publications ("Yellow Pages"),[15] none of the services purchased are those complained of on appeal. SW Bell does not purchase any goods or services in connection with the publication of yellow pages directories. Therefore, the section 41(c)(1) requirements do not apply to the internal expenses of Yellow Pages. We conclude that it was not necessary for the Commission to make the findings of fact otherwise required by section 41(c)(1) as to the imputation of Yellow Pages revenue to SW Bell.

■ The Cities also argue that SW Bell failed to present sufficient evidence to support a finding on the reasonableness of Yellow Pages expenses. The record reflects substantial evidence that Yellow Pages expenses were reasonable and necessary. We will not substitute our judgment on this evidence for that of the Commission. For the above reasons, we overrule the Cities' fifth point of error and OPC's fourth point of error.

## McKinney Extended Metropolitan Service

McKinney complains by five separate points of error of the provisions of the Commission's order setting SW Bell rates applicable to McKinney residents for extended metropolitan service ("EMS"). EMS is an optional service whereby customers in outlying exchanges surrounding a large metropolitan area may pay a fixed rate for what would otherwise be long-distance calls within that metropolitan area.[16] McKinney complains of the failure of the Commission to state underlying findings of fact and the sufficiency of the evidence to support the Commission's findings (1) that existing SW Bell EMS rates were just and reasonable and not discriminatory; (2) that the application of the existing SW Bell EMS rates to McKinney and other exchanges was just and reasonable; (3) that the EMS rates set out in the stipulation were not unreasonably discriminatory; and (4) that identical EMS rates should be set for companies other than SW Bell.[17] McKinney also complains of the sufficiency of the evidence to support the Commission's rate group reclassification of the McKinney exchange. Each of McKinney's complaints attack the rate-design portion of the Commission's decision.

---

15. SW Bell contracted with its yellow pages affiliate for the production, publication, and delivery of its white pages directories during the 1988 test year. SW Bell also contracted with Yellow Pages for the sale of white pages bold listings for the 1988 test year. Appellants have not complained of the inclusion of these expenses in cost of service.

16. This service is similar to Extended Area Service ("EAS") under 16 Tex.Admin.Code § 23.49 (1992).

17. The Commission's conclusions of law on rate design and EMS issues include the following:
 44. The rate design and rates resulting from the Stipulation do not grant an unreasonable preference or advantage, or establish unreasonable differences as to rates or service between localities or between classes of service.

45. The rates resulting from the Stipulation are just and reasonable and not unreasonably discriminatory, and are in the public interest.
....
64. [SW Bell's] current EMS rates are just and reasonable and are not discriminatory.
65. The application of the current EMS rates to the 22 [SW Bell] exchanges to receive EMS pursuant to the Stipulation is just and reasonable.
66. The approval of the EMS provisions of the Stipulation is in the public interest.
67. The differential between the Tier I and Tier II EMS rates is reasonable and not unreasonably discriminatory.
68. As shown in Finding of Fact Nos. 410–437, making EMS service available on an optional basis to customers in the ten independent company exchanges surrounding the [SW Bell] metro exchanges is reasonable and in the public interest.

■ In its first two points of error, McKinney argues that the Commission failed to make underlying findings of fact to support its conclusions that SW Bell's existing EMS rates were just, reasonable, and not discriminatory, and that it was just and reasonable to apply these rates to twenty-two additional exchanges, including McKinney, as set out in the stipulation. When an ultimate finding of fact is set forth in statutory language, it must be accompanied by a statement of underlying facts. APTRA § 16(b); *Texas Health Facilities Comm'n v. Charter Medical–Dallas, Inc.*, 665 S.W.2d 446, 452 (Tex.1984). Assuming, without deciding, that the findings McKinney complains of are ultimate findings of fact, we conclude that the Commission made adequate underlying findings. In *Charter Medical–Dallas*, the Texas Supreme Court set out the criteria to examine findings of underlying fact:

1. the findings must be clear, specific, non-conclusory, and supportive of the findings of ultimate facts on the statutory criteria;

2. mere recitals of testimony or references to or summations of the evidence are improper;

3. the findings must be stated as the agency's findings; and

4. the findings must relate to material basic facts and relate to the findings of ultimate fact that they accompany.

*Charter Medical–Dallas*, 665 S.W.2d at 451–52. However, in applying these standards we should not be "hypertechnical" in requiring a precise form of findings of underlying fact. *Allied Bank Marble Falls*, 748 S.W.2d at 448–49. To support its conclusions of law on the EMS rate design, the Commission made numerous findings of underlying fact including the following:

231. The rate design objectives of promoting universal service, encouraging further development of the Information Age in Texas and promoting equal opportunities for competitors were utilized by the Staff in evaluating the Stipulation rate design.

. . . .

234. The Commission Staff has thoroughly reviewed the rate design proposals contained in the Stipulation in light of the major policy provisions of PURA and the rate design goals of the Staff.

. . . .

412. There is a strong demand for expanding calling scopes as evidenced by the numerous requests pending before the Commission for Extended Area Service (EAS).

413. The EMS provisions of the Stipulation allow the Commission to address a number of EAS issues and significantly reduce the backlog of EAS requests pending before the Commission.

414. The expansion of optional, two-way, flat rate calling in the metropolitan areas will promote both the economic and social interests of the communities.

415. The Stipulation will provide EMS to the following 22 [SW Bell] exchanges . . . *Tier II* . . . McKinney. . . .

. . . .

418. The rates for the 22 [SW Bell] exchanges receiving EMS pursuant to the Stipulation will be identical to the rates for the 19 [SW Bell] exchanges that are currently receiving EMS. These rates are as follows:. . . .

419. Establishing rates at such levels will promote rate uniformity for customers in similarly situated exchanges.

420. Tier I exchanges are contiguous to a Metropolitan calling area while Tier II are not. There is a proportionate relationship between the distances of the Tier I and Tier II exchanges to their respective metropolitan exchange and the EMS rate levels for the Tier I and Tier II exchanges.

421. There is insufficient evidence in the record to permit the Commission to set exchange-specific or metropolitan-specific rates in accordance with Section 23.49 of the Substantive Rules for the 22 [SW Bell] exchanges that will receive EMS pursuant to the Stipulation, or for the 19 [SW Bell] exchanges that presently have EMS.

The Commission enjoys broad discretion in determining whether a rate design results in just, reasonable, nondiscriminatory rates. *City of El Paso*, 839 S.W.2d at 932. As stated in *Texas Alarm & Signal:*

> In general, § 38 requires rate structures to be just, reasonable, and not unreasonably discriminatory. This broad standard allows the Public Utility Commission discretion to determine the method of rate design. It also gives the Commission the discretion to consider factors other than cost and adjusted values of property. Rate design is a complex matter that involves many factors.

603 S.W.2d at 772. Absent a showing that the complained-of rates are unreasonably discriminatory, we will not overturn the Commission's approval of a rate design. *Public Util. Comm'n v. AT & T Communications of the S.W.*, 777 S.W.2d 363 (Tex. 1989); *City of El Paso*, 839 S.W.2d at 932. McKinney argues that the Commission improperly failed to consider cost factors in setting EMS rates, as allegedly required by the policy set out in Rule 23.49. *See* 16 Tex.Admin.Code § 23.49 (1992). The Texas Supreme Court has rejected the argument that rate design and individual rates must be based on cost analysis. *Texas Alarm & Signal*, 603 S.W.2d at 770; *see also City of El Paso*, 839 S.W.2d at 933–34. In making a determination of rate design, "the Commission may consider factors in addition to the cost of providing service, keeping in mind the overriding considerations of consistency and the utility's burden of proving that its proposed rates are just and reasonable." *City of El Paso*, 839 S.W.2d at 932. We conclude that, empowered with this broad discretion, the Commission could properly base its rate-design decision on the factors set out in its findings of fact. Additionally, the enumerated findings of fact reasonably support the Commission's conclusions in setting EMS rates applicable to McKinney and otherwise satisfy the *Charter Medical–Dallas* criteria.

■ McKinney also complains of the sufficiency of the evidence to support these findings. Under the substantial-evidence test set out above, we conclude that, based on the evidence in the record, the Commis-sion could reasonably have found that existing EMS rates were just, reasonable, and not unduly discriminatory, and that application of the existing rates to McKinney was just and reasonable. We overrule McKinney's first and second points of error.

■ McKinney's third point of error complains that there were no underlying findings of fact and insufficient evidence to support the placement of the McKinney exchange in Tier II for EMS rate purposes. McKinney argues that the only evidence in the record supports placing it in Tier I. The criteria used in placing exchanges in Tiers I or II was contiguity with a metro exchange. By placing McKinney in Tier II, the Commission impliedly found it was not contiguous to a metro exchange. The record shows a factual dispute whether McKinney meets the criteria for a Tier I exchange. This issue was resolve by the Commission. McKinney also complains that the Commission's finding that the differential between Tier I and Tier II rates was reasonable and not unreasonably discriminatory is not supported by substantial evidence. We note that "[e]xisting classification schemes previously approved by the Commission are, prima facie, not unreasonably discriminatory, and the complaining party has the burden of proving that the classification produces unreasonably discriminatory rates." *City of El Paso*, 839 S.W.2d at 932–33. We find substantial evidence in the record to support the conclusion that the Tier I–Tier II differential is reasonable and not discriminatory. We overrule McKinney's third point of error.

■ In its fourth point of error, McKinney complains of the sufficiency of the evidence to support the rate group reclassification of the McKinney exchange. The exchange rate group classification determines local exchange rates and is based upon the number of subscribers within the local exchange. The Commission found that the "rate group reclassifications proposed in this Stipulation are supported by the evidence and are reasonable." We conclude that substantial evidence exists in the record to support this finding. According-

**950**

ly, we overrule McKinney's fourth point of error.

 In its fifth point of error, McKinney complains that the Commission's approval of EMS rates for four local telephone companies [18] other than SW Bell was not supported by underlying findings of fact and substantial evidence. We conclude that the Commission made underlying findings of fact that satisfy the *Charter Medical–Dallas* criteria and that substantial evidence exists in the record to support the application of the SW Bell EMS rates to other companies. We overrule McKinney's fifth point of error.

### CONCLUSION

We overrule the appellants' points of error with the sole exception of the complaint that the Commission did not correctly apply the law as to income-tax savings resulting from expenses disallowed for ratemaking purposes, which we sustain. We therefore reverse the district court's judgment and we remand the cause to the district court with instructions that the cause be remanded to the Commission for further proceedings consistent with our opinion.

---

**18.** GTE Southwest Inc., Lufkin–Conroe Telephone Exchange, Guadalupe Valley Telephone Cooperative, and Central Texas Telephone Co.